Good morning. The next case on today's docket is a consolidated case of the interest of H.C.A.C. and C.C. Junior minors in People of the State of Illinois v. Jamie C. and Charles C. And we have Mr. Brian Kibler for the appellants and Mr. Patrick Daly for the appellee. And you may proceed, Mr. Kibler. Thank you. I would please the floor, counsel. My name is Brian Kibler and I was court appointed by the Circuit Court of Shelby County to represent the respondent parents in this appeal before us today. In this appeal, the respondent parents, who are actually present here today, contend that the Shelby County Circuit Court erred when it first found respondent parents to be unfit. And then also the Shelby County Circuit Court erred when it found it to be in the best interest of the minor children to have parental rights terminated. Now, by way of background in this case, DCFS involvement really began back in 2008 through their NTAC program. During that time, DCFS and its representatives provided in-home family services to the respondent parents. During the 15 months or so that NTAC services were provided to the respondent parents, the children were not removed ever from the home for having an environment injurious to the welfare of the minor children. What ends up happening is in early March of 2010, the NTAC caseworker goes to the residence and sees that the youngest child, who is still an infant, has essentially bruises, sores up and down her body. And also the NTAC worker noticed that the minor child, who was the youngest of the three children involved here, was having difficulty breathing. The NTAC worker told the parents, take the child for medical care. However, a couple days go by, and then DCFS receives essentially a hotline report saying that the parents still haven't taken the minor child for care. DCFS goes to the house, sees that the minor child's condition has actually worsened. They determine that the parents had not seeked the appropriate medical care for the child, and DCFS immediately took all three children into shelter care. The minor child did receive medical services because it was under the care of the department, and then a couple days later, the shelter care hearing occurred. At the shelter care hearing, the primary reason, and it was, I believe, a contested DCFS caseworker appeared on behalf of the state as the sole witness. The caseworker testified that the parents failed to provide the adequate medical services for the youngest child, which would be HC. That was the reason for that child's removal. And then when it came to the other two children, your honors, the court found that on the shelter care basis that the environment was injurious to the welfare of the other two children, and that the responding father lacked the basic parenting skills to properly care for the minor children. That was the basis for removal at the time of shelter care. Later on, a couple months in May of 2010, there was a re-joint adjudication disposition hearing. At that hearing, the parents both conceded or consented to adjudication being entered in a dispositional order where the children would remain with DCFS in their care and custody, and that the goal would be return home within 12 months. At that hearing, there was a stipulation entered on the record, and that record would be found in, and I think it's important for the court to go back maybe and review it, but it was essentially at 359 to 360, there was essentially a factual basis entered on the record. The stipulation entered on the record primarily concerned how the parents failed to provide adequate medical care for the minor child, and that essentially the parents lacked basic parenting skills and remedial parenting skills necessary to raise the minor children. That was essentially the stipulation agreed to at the time of adjudication. Now, over the course of between May of 2010 until we get into the early parts of 2012, the goal is to remain home. However, essentially the state comes back and files, it wasn't technically a petition to terminate, but it was a supplemental petition of an appointment of a guardian with power to consent to adoption, which is essentially the same thing, involves the same steps, we have to terminate parental rights, do the same process, you have to make a finding of fitness, then a finding that it would be in the best interest for parental rights to be terminated. So the goal ends up changing, and then in June, actually it was in November of 2011, it would have been almost a year ago, the fitness hearing was actually contested. At that hearing, the whole primary focus of that fitness hearing was regarding the living conditions of the house, the living conditions, the actual physical living conditions in terms of cleanliness and how sanitary it was. Those were the primary arguments and focus of the inquiries at the time of fitness. And then after that fitness hearing where DCF or the state submitted just two witnesses and no other evidence such as pictures, the court founded the parents unfit because they had not made reasonable progress within nine months to provide a safe and suitable living condition and environment for the minor children. And then a couple months later at the fitness hearing, the court, not the fitness, the best interest hearing, the court, after hearing testimony from essentially the foster parent who wanted to adopt, the DCF best worker again, and after considering the testimony of the minor parents, the court determined it would be in the best interest to terminate the parental rights of the parents. That's essentially the nutshell of the facts. When it comes to the issues of unfitness and best interest, the respondent parents believe that the circuit court erred when it made its findings. Now on the issue of unfitness, I think there are a couple issues in here that the average practitioner, the person out on the street handling these cases, can identify with two of the major problems that occurred in this case. Often I'll sit down with, by way of background, I'm not primarily an appellate attorney. I normally have a general practice in Effingham. I do a lot of work on behalf of respondent parents at the trial stage when the state has filed a petition for adjudication. So I'm there and I talk to the different attorneys and we all have some very similar issues or things that we want to hit our head or beat our head up against the wall. And these issues, two of these issues that we really struggle with daily as practitioners are evident in this case. And that's one of the reasons I wanted to appear before you is to at least explain what we out there, essentially out on the streets are trying to deal with every day and the frustrations that occur because they are evident in this case. And as it relates to unfitness, two of these everyday problems that we incur are evident. First off, in the unfitness thing, originally what would end up happening is the state will come and take the child away for reason A. And then by the time we progress two years later, we're not focused on reason A anymore. The reason why the children should stay away is because of reason Z that was not there at the time of shelter care for adjudication. In this case, the record, if you look at the shelter care hearing and you look at the stipulation at the time of adjudication, the focus is on the fact that these parents lack basic skills to parent and that they fail to provide adequate medical care for the children. That was the reason why they were taken. There was no discussion at shelter care really or adjudication that they should be removed because of an environment that's unclean or unsanitary. Is that subsumed into a lack of appropriate parental skills? Well, it normally could be assumed to be that. However, one of the things that I find interesting is that the intact workers with the department had been in that home for 15 months prior to the actual taking of the children for shelter care. They had never removed the minor children up until that date and time. It stands to reason that if a department worker was so concerned about the sanitary conditions of the home at the time that they were there, it stands to reason that if the department really had a major concern with it, they would have removed them prior to this child having medical injuries. Another problem that maybe just assuming it's all parenting skills includes the whole concept of clean environment, comes back to the fact that at the time of adjudication, at the time of shelter care, we have no real evidence in the record what really were the conditions of the home. So now, two years later, we want to say the parents haven't made reasonable progress towards the living environment of the home. Well, how can the court really say that when we have no benchmark from the time of removal until the time of termination as to what really the conditions were? We're just digging assumptions into the record. I mean, you look back at the time of the fitness hearing, the court's hearing evidence from DCFS and from the homemaker about the conditions of the house, and yet we don't have any real record to rely back upon to see what really the conditions were. And there's another issue kind of with what was going on here. The court solely relied on the testimony, the actual word of the caseworker and homemaker. There was never any physical evidence such as pictures, videos of what really was going on in the residence at the time of shelter care. Are you saying that's unusual or required or what? Well, I'm not saying it's required. It's just I don't want to get into what I've seen in other cases, but normally if you're going to make a big deal out about what's going on in the house, there should be more evidence than just simply a shelter care worker, I mean, a DCFS worker and a homemaker. There needs to be a better record. Now, it's kind of… There isn't just one indication, though, that there's problems with the way the environment is managed. I mean, I thought it was throughout the record. Well, I mean, at the time of the stipulation at the shelter, the adjudication doesn't really go into the living conditions or how they were. At the shelter care hearing, there was an issue where the DCFS worker did indicate that the house was not real clean, but it wasn't a reason for removal. They indicated that at the time, you know, the impact worker would, you know, right up until the time that they took the child, had been constantly urging the parents to clean the floors because the kids' feet were always dirty, to do a better job just generally cleaning the kids because they were often filthy. But really, in the early part, there really is not, in my opinion, much evidence of what the conditions were at the time of removal. But when you're talking about what's sanitary and unsanitary, you're just relying on a worker's work for it. I mean, and that's kind of getting into the second thing that we practitioners struggle with every day is what is too unsanitary, what is too unclean for a child to be unsafe? I mean, we often hit our head up against the wall on that. Now, I think there have been some other cases, and it escapes me, that the courts have tried to make this more of an objective standard. However, on a practical level, when you're just hearing, you know, what one caseworker says versus what a parent says, and there's really no direct physical evidence, it's becoming more of a subjective standard. I think there, without getting into all the animals, I don't think I want to really go there. Correct. But there was, I remember reading that there was no heat in the house upon one visit. That is correct, yes. I mean, but again, let's go back to issues of what, you know, we don't really have a benchmark from where we started to where we ended. It kind of just evolved from being a case about, you know, this lack of medical care to, oh, now they don't have a standard living environment. However, you know, but what I would like to add is there was testimony from the caseworkers regarding the lack of heat. However, there's really, you know, it gets into another little problem with this case, is the court found that the parents failed to make reasonable progress within nine months from removal. Well, when the caseworker's saying this about these visits, there's, I'm never really sure what the timeframe is. And in fact, by the time we get to the issue of what, you know, eventually after the kids are taken and after adjudication, the parents separate and they live in separate houses. And what was kind of confusing to me, and I wasn't the primary, I didn't handle this at the trial level. I got this file in August, was really my first contact with it. It appeared, it's unclear to me what the dates were of these visits that they're saying weren't, you know, there was no heat, et cetera. I mean, so that's another issue when we're talking about changing our focus from medical care to environment. You know, what are our timeframes? I mean, but it's clear that that visit, though, that you're talking about, about being no heat, that was nine months after. But when precisely was it? That's another problem. But when you're changing the focus from one thing and making it all about another. But then the other confusing part was the whole, you know, a lot of the evidence and a lot of testimony at the time of adjudication, or fitness hearing, was about each parent's respective environments at the time of hearing. And that's what a lot of the testimony concerned, especially from the caseworker and from the homemaker. What were the conditions of the parent's home at the time of fitness? Rather than, you know, the folks seem to be more about what they were doing like 18 months later rather than nine months later. And the court says that they failed to make reasonable progress within nine months. And that's important because if you look at it, the evidence and what the parents presented, especially in regards to the respondent mother, who actually did provide pictures of what her environment was, she provided testimony of what her living environment was as of the date of fitness. And if you look at the evidence that the parents, as of the date of the fitness hearing, we believe that the evidence shows that they did have some sort of suitable living environment for the minor children. Now, the DCFS caseworker still didn't believe it was suitable at the time, and they kind of nagged about the fact that there were still dirty dishes, there were still maybe not electrical plate coverings in Dad's residence that he had in, I believe, it was Christian County by then. They seemed to be focusing on little things rather than the general problem of being no heat, being too many animals in the house. I mean, they were essentially demanding, you know, almost perfection. And it's kind of another thing we sometimes complain about, you know, practicing attorneys is DCFS comes in, we take the child, all right, for reason X, we get our foot in the door, and then what we start demanding is perfection from these parents. And obviously most of the parents, Your Honors, who go through this process are not at the high-functioning end. I mean, they struggle, you know, they maybe are a little less functional. And so we're then demanding them to be perfect, to provide a perfect house. And I believe if you look at the testimony of Ms. Sanborn, it seemed to be like she was focusing on the imperfections rather than, okay, if we put these kids in this house, are these kids going to have adequate water, are these kids going to have adequate living environment rather than a perfect living environment. And so... Was there testimony to the fact that it was adequate? It was not adequate was what the DCFS... But there was no evidence that it was adequate? I mean, there was any counter evidence? There was counter evidence from, in regards to the responding father, he provided evidence of what his living environment was, what his living arrangements were, but he provided no pictures. However, the responding mother did at least provide pictures of what her living environment was as of the time of fitness. So they tried to counteract that evidence. Essentially, it was the DCFS workers saying, no, it wasn't suitable. The parents said, you know, it was suitable. The responding mother did provide photographs of her current living environment. Responding mother's mother, who would be the maternal grandmother of these children, provided evidence. In fact, you know, she originally said, and the best evidence the state has that the living environment were still bad nine months after the case actually did come from responding mother's mother, who did say that the living conditions that they had were actually horrible for a time. And she admitted that her own daughter provided an unsuitable living environment. However, the mother then turns around and says, yeah, she corrected most of those problems. The living environment she had as of the time of fitness, I mean, were suitable for minor children. But it gets back to, like, the subjective nature of it, where you just have the case workers saying something and providing no further evidence. I'm not saying that it shouldn't count for something, but, you know, we're terminating criminal rights. And I know it's trite. I know every attorney who comes before you and says, you know, you hear this in every juvenile case, you know, outside of maybe killing somebody or throwing them in prison, the worst thing the state could ever do was take away the children. And I hate saying that because I end up using that in every argument as a crutch, so does every parent who responded father or mother. But it happens to be true. You are going to permanently extinguish the rights of these parents, permanently extinguish the rights of these kids to know their parents. I mean, it just seemed very haphazard how the state presented their evidence as to fitness. They present a case worker, a homemaker, they talk for a little bit, but there's really no evidence to back up their claim. I thought you said there was photographs. There were photographs. The photographs did not come from the DCFS case workers. The photographs in evidence come from the responding mother. Oh, okay. There were some descriptions, however, that sounded fairly like a very unhygienic environment, like rat nests, apart from the fact that they were raising rats apparently in the house. Yes. And then I was confused by the one description of a room that contained 100 field mice, and I presumed they were dead. I'm not even sure, but that did not seem like a very hygienic situation. Well, that gets back to what it was. Can I understand? I still struggle kind of with what the actual evidence was of fitness because we seem to skip around here and correct and cross about where they were when they were together, how bad were the conditions of the house when they separated, what were the conditions of the residence, and what were the conditions of the residences as of the date of fitness. Well, now, when they separated, where were the children? The children were with the department. Okay. So, okay. That's what I understood. And it seems that one of the things is what happens is the department takes the kids away from the parents, and then they go back in there and try to work on improving it. And I believe it was the homemaker who had to sit down and have a conversation with the mother that you cannot have mice and rats in your drawers, and so they worked on cleaning that up. Eventually what happens is the parties – Because now you can see where that is both a hygienic issue as far as an injurious house and a lack of parenting skills and understanding how important that is to the health of the children. I mean, they don't – you can't separate them. They're all tied up in one big bundle. I understand what – Unless we are just talking about clutter. And that's not what I gather from the record. I'm talking about being perfect. It was more than clutter. Leaving dirty dishes. Brought in food, and with a child that has open sores, obviously there could be a very direct connection and a very serious connection. Well, I respectfully understand what the court's concerns are, but part of the problem is that we really don't know how bad the conditions were. And it's unclear to me really when the nine months were up. What really were the conditions nine months later? Because it is clear from the record that respondent parents can make a very legitimate point that by the time fitness comes around, they've corrected those mistakes, those problems. That was their testimony, but not the testimony of DCFS. Well, in terms of the rats and mice, they weren't there as of the time of fitness hearing. The father had moved out and she was essentially his mother's residence, which the homemaker essentially said was really no problem anymore. So she wasn't worried about the father's living environment as of the date of fitness. Also, in terms of what the living environment was, I don't believe the homemaker indicated that there were still mice and rats in the house as of the date of fitness. So really, it really comes down to what were the – when you're talking about failure to make reasonable progress within a certain amount of months, it's unclear to me really what was going on in month nine. When did really the conditions improve? Because it is clear from the record that the mother and father's living environments did improve by the time of fitness. But have they been done so adequately within a reasonable amount of time? Were there efforts to improve their house? Were they reasonable? That's one of the things that just seems kind of unclear to me, what really was going on. And I think part of that is an offshoot of the fact that we start off with taking the kids away for medical reasons, and then we end up over here with that. That could be a reason. But again, I respectfully – I respect you guys listening here. I respect the Court's time. Thank you very much. You'll have the opportunity for rebuttal, Mr. Kibler. Mr. Daly? Good morning, Your Honor. Good morning. Counsel. Before I launch into my argument here, I do want to throw one cautionary comment out. A lot of the discussion about what the conditions were of the residences of the respondents at the time of the unfitness hearing, this is a – the only allegation found and really actually kind of argued by the State was whether the respondents had demonstrated reasonable progress within nine months of the adjudication of neglect. So conditions that existed, whether favorable or unfavorable, whether it's good for the respondents or good for the State, is irrelevant at that point because the Court's and this Court's focus has to be limited to the initial nine-month period. So, you know, there was some discussion in the respondent's brief. I don't want to nor is it appropriate probably to engage in that in the context of fitness. With regards to best interest, that's fine because that's where you take everything into consideration. But this is – in fact, there are courts that have been reversed for considering evidence outside where it's been demonstrated that little courts have considered evidence outside the nine-month period. I'm taking a slightly different tact here than the Respondents' Council, I suppose, because I wanted to argue this case and I don't – I'm not the type to necessarily create issues and make my life difficult for myself. But there was an argument in the Respondents' Brief that I found rather true, and that was that you could probably take an objective view of the evidence that the State presented and say that they were a bit sketchy on the details about what was happening during this nine-month time period. What we see in a lot of cases are courts – certain courts and courts of review considering testimonial evidence and evidence that's derived from the DCFS reports and progress reports. And this is one of those cases where it's the evidence in the progress reports is demonstrably more specific and a lot of which Justice Chapman referred to was actually taken from the reports themselves rather than testimony. Courts have – the Juvenile Courts Act and the Adoption Act allow for the admission of DCFS reports by way of judicial notice. That's exactly what happened in this case. There was no objection to it. They were utilized by Respondents' Councils in cross-examination. So I think that – my concern is this, and I think Your Honors will understand. I have a little bit of a fear that termination cases are starting to slip towards what we saw happening in mental health cases where hearings have become sort of shove something in front of the court and then we don't really have any kind of procedural, you know, fleshing out of evidence in that matter. And as this Court's aware, there's been a lot of problems, hopefully getting a little bit better in mental health cases. I do ask then, I guess in that sense, that there are courts out there that have begun to address this issue of how it should be presented to the court in order to take judicial notice of something, and there has to be by way of business record exception. It's not a particularly complicated thing, and I don't think it means anything in this case given the full context of the lack of objection, the lack of prejudice, and the fact that both declarants testified at the unfitness for hearing. But I do want to bring this to the Court's attention just because I do feel that in order to make the argument that I make before this Court, I have to almost necessarily rely to a large degree upon the contents of the report. And I do think that there is evidence, at least testimonial, to support the Court's finding, but I think you'll also find, like, when you look at the DCFS worker's testimony, it really was sort of, well, they have tasks, they didn't complete any of them in 18 months, and therefore they did not make satisfactory progress. Taking that outside of any relationship to what's actually in the reports is a difficult proposition for the State to say that's good enough. So I just want to bring that to the Court's attention now for its consideration in the fact that I rely heavily upon the reports in the State's case. Taking up the respondent's argument specifically, I understand the argument that it is, that you have a basis for children to be removed from the home, and that that is perceived to be, is sort of a guideline by which everything else after that should be focused towards addressing. And clearly that has to be addressed. But the Supreme Court has made clear in this case, in race CN, that there is no limitation on what DCFS or the grounds for fitness can be premised upon strictly based upon the facts that gave rise to the removal of the children. The Court has made clear that oftentimes it's only until the intervention of the Court's DCFS and other assisting agencies that more problems come to life. And as Respondent's Counsel adequately noted, correctly noted, this DCFS's involvement in this case actually dates back to 2008, so this isn't a new situation. But I do think there is a compelling argument to be made that when you have a child who has an infected ear, has severe diaper rash likely resulting from prolonged contact with urine, has a rash under the arm, around the neck, has some respiratory problems, all of these were caused not by some kind of disease, but they were caused by conditions that were existing in the home that related to cleanliness and the ability to care for someone. And it's, I think, impossible for any trier fact to pry apart the considerations of the environmental conditions of a home and that relationship to the health and welfare of a child. And we have, of course, demonstrated that this child was injured and was injured as a result of a home environment. Now, this is a case where I would acknowledge that the parents, they care a lot. And they did a lot of what a DCFS has to do as far as perhaps obtaining counseling. Did they complete any parenting classes? They were at least attending them, which is more than what I usually see. And currently or at the time? I don't know. At the time they were. At the time they were. And there was, if you look at the DCFS reports, both the 911 and I think really throughout the case, for the most part they were, they did attempt to do, they were good with visitation, they were good with counseling. And they're here today, which is something I don't see very often either. And that's very commendable as well. But I don't think it should be. It's obvious that they love their children. Absolutely. I will never contest that. But it's also very obvious that for whatever good intentions they were, they weren't capable of keeping a home adequate and safe and environmentally secure for these children. And that's really the paramount consideration when we talk about the unfitnessing, because by providing services to the parents, what we've done is we've given them a means by which they can fix the problem. It's something that DCFS requires. It's a key to unlock the door. So they took hold of the key, but they can't seem to unlock the door. And the ability to correct the conditions, the ability to solve these problems that existed in the home all the way through, at least the initial nine months of this case and beyond, are really the best example of any of that other stuff working for them. Okay? If you internalize it but you don't put it into practice, it really isn't doing any good. So I do want to be clear that I think that these are well-intentioned parents, and I'm happy to see that because I certainly see a lot of the opposite. But it's important that this court see that it is not nitpicking, it is not trivial, it is not just a hyper-management by DCFS or state agencies to address these problems that they've had. And throughout the nine months, we've seen, both from the testimony and from the DCFS reports, issues regarding significant clutter, food that was left to rot. Now, the dirty dishes thing, you know, I guess if they were the only thing that were the problem, then, you know, wow, we probably all left dirty dishes in the sink at some point or another. The distinction is this. You haven't been put on notice from the get-go. I mean, the court, at the time of the determination of adjudication and neglect, said you have to comply with DCFS. You have to do what they tell you to do. If you don't do it, you risk termination. Okay? It's not a particularly horrible task. The fact that you call nitpicking or trivial I think sort of underscores the fact that that's true, then why can't you do it? Okay? And what we have here is a situation where this worker, the home worker from Addis, she testified that not only did I go through and point out all the problems, she physically demonstrated them. Here's what you need to do to fix it. And they still weren't getting it fixed. They might fix one thing, but then something else happens. And I think that's where the nitpicking argument kind of arises. Like, we get one thing done, then they point out something else. Well, this is a situation where you almost have to do that, because I don't think that they have the capacity to do a global comprehensive job of fixing everything at the same time. But the problem is once one thing gets fixed, something else slides back to poor conditions. And I'm not going to go through all the details of the reports and all that. This court has all that at its disposal. Obviously, our position is that when you assess the reasonable progress standard and you measure versus, you know, where we started and where we ended in nine months, there really wasn't much progress at all. For every good thing, there was a bad thing. We had, you know, issues with cleanliness and issues with paint chips and ceiling collapsing and all that. So I would emphasize to this court that it is a very important, perhaps paramount consideration was their ability to progress in the requirements that they create an environmentally stable and secure home. In the first nine months, most certainly, post-adjudication neglect, the respondents were not able to do this. They may have tried, but they couldn't get it done. And that's hence why the court's determination of lack of reasonable progress was correct. And I guess that sort of answers part two of the respondents' argument, what did we consider to be too unsanitary. Well, obviously, I am not advocating that we take an overly mechanical approach to these types of cases and say, okay, well, GCFS lists five things, and if they do three of the five, that's reasonable progress. If they only do two of the five, that's not reasonable progress. And I don't think anyone would advocate something so rigid as that. But I think that the fact that it becomes, you know, an objective type of analysis is exactly why we have hearings, why we have courts to hear the evidence and make these determinations. You know, we've invested courts to hear these things and to ask. They're wards of the court, okay, these children are. So they're there to hear everything that's relating to this particular case that's now before the court, focused on the parents' progress, not the children's best interest, of course. But they have to look at what have they done and what can I, as a judge, safely say at the end of this nine-month period, they've met a standard that I could perceive to be a standard of cleanliness. Because certainly GCFS has found that to be the case. And although GCFS's word is not the end-all, be-all of what a court has to do, it's a particularly strong one because that's their job. And their testimony in this case and the reports that were generated in regards to the nine months post-adjudication were really unequivocal, that they did a little bit, but they weren't doing enough, and it wasn't nearly anywhere near. Do you often see pictures of living conditions? No, I don't. Although I understand the argument the counsel is making. I think it would certainly be helpful. Well, it would be very good evidence. It would be very good evidence. And I'm not going to try to make excuses for anyone, but GCFS workers have a mountain of stuff to do and get through. They can't treat every home as a crime scene and take photographs of everything and create a record. And at this point, there's still a hope that these parents are going to get their act together and eventually achieve reunification. So, you know, I wish that were the case, and if it were within my control, I would certainly need the prosecutor advising me to do so, at least as we get closer towards making hard decisions about how to proceed on the case with regards to custodial considerations. But that being said, again, this is like any case where a court is to weigh the evidence and weigh the credibility of the witnesses. And in this case, both the respondents testified and they gave their impressions of things, and the court had at its disposal the state's evidence, testimonial and report lies, and it made its determination. The absence of video or photographs goes to the weight, but it's not an indispensable part of any kind of ability for the state to meet that clear, convincing standard of fitness. So we haven't discussed the best interest hearing. Counsel may do so when he comes back up here. I still have a little bit of time, but at this point I'm just going to rest on my brief on that regard, unless this court has any questions about that. At that point, of course, the interest of the parents yields to the best interest of the children. So it's, again, a situation where we have two parents, I think, that really love and want to be with their children, but it's the children's interest at stake now, not the parents' desires, and the court has to weigh the competing facts. And the bottom line, the absolute truth of this is that all three children have spent almost all of their lives in foster care at this point, and, of course, the paramount goal of any action here is permanence. Can you just roughly tell me how long they've spent in foster care? The testimony was 22-and-a-half months. The children at the time of the best interest hearing were four, three, and two, I believe. So the youngest child, I believe, went into foster care after the case had already started, if you will. So they're very young. I believe it was the middle child, perhaps, that was the starter. Yeah, I believe so. So I asked the court to look at the evidence there, and also I've outlined in my brief certain statutory considerations for the court to consider. There's a number of things that involve stability and bonding and relationships, and at this point it's hard to deny the fact that they were in a loving, caring, stable environment with people. They've known all their lives, essentially, with their parents, and there are still ongoing problems with both parents. At this point, they're separated. Those are competing factors the court had to take into mind in assessing if it will be in the best interest of the children. So we ask this court to affirm the lower court's judgment of termination. Does the court have any other questions? I don't think so. Thank you. Thank you for your time. Thank you. Mr. Kibler, you have rebuttal. I appreciate Mr. Daley's statement. His tone was very honest in what he said, and one of the honest things he said was a lot of the facts at the fitness hearing were sketchy, and you have to use all these other reports to kind of fill in the details. And I think that's an important word because we're dealing with sketchy facts. The consequences are so great. This is such an important matter that you guys have to decide. You've got to decide what the parental rights are with these parents and their three kids. And the testimony even from the state, from the caseworkers, these parents love their kids. There is a bond there. But it's up to you to decide whether sketchy facts at fitness kind of being supplemented by reports is enough to find if the parents were unfit. That is the primary argument I've made. What is the standard review in this case? It's an abuse of discretion, Your Honor. Did the court abuse its discretion in finding the kids unfit? We believe firmly that it was an abuse of discretion. The facts weren't there. The evidence wasn't there. And so there's no way that the state could have met its burden of proof. Now, one of the other things I'd like to bring up here in rebuttal is the issue of Justice Chapman asked about goals, how the department puts goals in front of the parents for them to complete. I would point out that in regards to the respondent father, Ms. Austin, the caseworker, did indicate that for the most part, as of the time of fitness, the respondent father had done most of the things she'd asked of him. She said there were a couple of things that were still in need of work. But for the most part, he had done most of the goals she had set out for him. But in regards to the respondent mother, she indicated that there were still a concern with the regards of the living environment. Was the mother still living in the original home? I believe she had moved out, Your Honor. That is a fact that is escaping me at this moment, Your Honor, and I don't want to misrepresent the facts. I apologize. That's okay. We'll find out. So in regards to at least the respondent father, he had made substantial progress towards the goals, at least at the time of fitness, several, you know, 18 months later. And that was at least verified by the caseworker. Now, briefly, the court did touch on the interest of best interest. The best interest hearing was also what appeared to be a very short hearing. The department representative, the foster mother who wished to adopt, gave testimony on behalf of what the kids' environment was like with them. And then in contrast, the respondents presented their testimony, which essentially said they had a loving relationship. Based off all the evidence, the evidence presented by the state in regards to the foster mother, you know, was what was short. I believe the court found the foster mother to be very believable, but it's kind of short on details, kind of short on facts in the direct examination. She talked about how the kids were doing, and there was no dispute that the kids were doing good in foster care. However, there wasn't a whole lot of evidence, specific evidence, from the foster mother regarding what the life were. And I think that also shows that maybe the court did abuse its discretion. However, Mr. Daley, the one strong argument the state does have is the fact that the kids had been in foster care for essentially half their lives as being the number one reason why the court should have found it in the best interest. I will counter with that by saying that the fact that there is still a bond between the children and the parents. I mean, these parents had actually consistently exercised their visitation. There was a bond from them. There was a bond from the children back to the parents. The fact that we have a bond between the parents outweighs the fact that the kids had been in shelter care for almost two years. And I'm not going to belabor the best interest point. I mean, the arguments were made by Mr. Daley from both sides. Parents love the kids, kids love parents, but kids need stability is what the state's argument is. And so I'll rely primarily on what my brief has to say on the best interest issue. But again, I'll go back to the overwhelming thing that in regards to fitness, the meat of the case just isn't there. It was not there at the time of hearing for the state. The state didn't provide the required proof, required meat of a case in order to meet its burden of proof, and therefore we respectfully argue that the court erred when it made its finding, and we ask that each and every one of you adopt the request of the responding parents to have the decision of fitness and of best interest reversed and remanded back to the Circuit Court of Shelby County. And again, Your Honors, I do appreciate your time on this case. This is a case of the issues brought up in these things are issues that we have to see every day in juvenile court. I know I have to go back to Effingham and do the juvenile call at 2 o'clock. These are the themes that come back up. And it's been a pleasure being able to address some of the concerns we see every day. And as Mr. Daley pointed out, there's this fear that we're going to backslide into what he called the mental health hearings. Maybe this is a time that we need to start putting maybe more teeth into what a termination hearing should be. That would be my respectful request. These are important issues, and I think what happens is because it's juvenile cases and you're dealing with state's attorney's offices who are underfunded, you're dealing with public defenders who don't really have the money and the resources to go out and investigate, maybe we are seeing a backslide of what the evidentiary process should be. Thank you, Your Honor. Your time is up. Thank you, Mr. Kibler and Mr. Daley. Thank you for your briefs and arguments, and we'll take this very seriously and are under advisement when we're willing to enforce. Okay. Next case on today's docket. Do we have the? Okay. Thank you. Are you here for? May I ask what you're here for? There's a stall. Okay. That's. You are here for people there's a stall? Yes, ma'am. And. State. Well, they got until. They got ten minutes. We're waiting for the state to arrive. They may be here and they may proceed as soon as they can. Let me just take a short break until they get here. Well. Oh. She went up. Oh, okay. Okay. So we'll take a brief break.